VERDELL KOCH AND PRISCILLA KOCH, HUSBAND
AND WIFE, APPELLANTS, V. NORRIS PUBLIC
POWER DISTRICT, APPELLEE.

632 N.W.2d 391

Filed August 21, 2001. No. A-00-375.

Elizabeth A. Govaerts, of Vincent M. Powers & Associates, for appellants.

Douglas J. Peterson, of Knudsen, Berkheimer, Richardson & Endacott, for appellee.

HANNON, CARLSON, and MOORE, Judges.

HANNON, Judge.

## INTRODUCTION

Verdell Koch (Koch) and Priscilla Koch sued the Norris Public Power District (Norris) for damages they suffered from a fire that started when a high voltage powerline maintained by Norris fell into their field and started a fire. The Koches appeal from the trial court's order granting a directed verdict in favor of Norris upon the basis that the doctrine of res ipsa loquitur did not apply to establish Norris' negligence as the cause of the powerline falling. We conclude that the facts in this case do establish a prima facie case under res ipsa loquitur on Norris' negligence, and therefore we reverse, and remand for a new trial.

## SUMMARY OF EVIDENCE

The Koches sued Norris under the State Tort Claims Act, Neb. Rev. Stat. § 81-8,209 et seq. (Reissue 1996). Norris did not dispute that the powerline fell and started the fire on October 26, 1996. Norris stipulated that the fire burned 86.6 acres of the Koches' field and did at least $41,243.25 in damages by burning the Koches' corn and other property. There is evidence of

additional damages to which Norris did not stipulate, but since this appeal is concerned only with liability, we shall not summarize that evidence. There is little if any dispute over the facts, only their legal significance. Only two witnesses, Koch and Kevin Pollard, a Norris engineer, testified at trial.

The Koches live on their 500-acre farm in rural DeWitt, Nebraska. Koch was 50 years of age at the time of trial, and he had lived on that farm his entire life. The powerline from which the line fell was south of the Koches' farmstead, and the break occurred about three-fourths of a mile from that farmstead. Photographs of the powerline show it to be a two-wire line on wooden poles, with each line attached to the pole by insulators and one line being approximately a yard above the other. Other photographs show two parallel powerlines in the air with visible splices evidencing that a length of wires of unknown length, but at least several feet in length, was spliced into one line. Answers to request for admissions show the distance between the two poles where the line broke was 325 feet.

Pollard had worked for Norris as an engineer for 16 years. Through him, Norris introduced a strand of wire which Pollard testified was like the powerline that fell. This line is composed of several strands of aluminum wire wrapped around a steel core. Pollard testified the wire gets its strength from the steel core. A photograph of a frayed powerline in the area that was still in its place was introduced into evidence for demonstrative purposes. This photograph showed some of the strands of the powerline were parted. Pollard testified that the damage displayed by this photograph was done by vandals (apparently with a bullet). He testified that the damaged wire remained in place because the steel core was still intact and only the aluminum strands were parted.

Koch testified that he saw the powerline approximately 2 days before the fire and did not observe any problems. He testified that the weather shortly after noon on October 26, 1996, just before the fire, was sunny and windy. He estimated the wind was blowing at 40 miles per hour. He was working on a grain bin which was situated about 2 miles from where the fire occurred when he noticed that the bin's fan stopped running and that power went out at the farmhouse too. He saw black smoke rising from the

field approximately 2 miles south. He called the fire department, and the fire was put out, but not before it did considerable damage. He admitted that he had no direct knowledge of the cause of the powerline's breaking.

Koch had never seen weather factors damage the lines along the field, but he admitted that he remembered tornadoes and ice storms which had caused damage to powerlines in the past. On October 26, 1996, dove and squirrel hunting seasons were open, but Koch had not seen any hunters or anyone else shooting at the powerlines that day or the day before. He does not drive the road in the area every day, but he did not see any cars in the area. He admitted that he had previously seen where vandals had shot at signs and powerlines in the past. After the fire, he did not observe any rifle or shotgun shells in the area of the burned field.

After the fire, Koch discussed the fire with Glen Schmieding, the "[h]ead of Norris Public Power." Schmieding admitted to Koch that a Norris powerline fell down and caused the fire. Koch asked Schmieding if Norris had saved the line that fell. Schmieding called the Norris office. It took Norris employees some time to respond, but Koch was told that the broken line had been found in a Dumpster. Koch was later told that this line was destroyed by testing. (There is no evidence showing which tests were performed and for what purposes.)

Pollard's department inspected the fallen powerline. Pollard examined the ends of the wire that broke. The damage was "pretty much smoke." The end of the conductor was "burned." The aluminum wire was "smoky." "Most of [the] damage that [he] saw was external, and [he] would assume [the damage occurred] after the fire on the ground." He testified that the condition of the wire prevented him from determining whether the damage had been caused by a bullet and that the condition of the wire made it impossible to determine whether or not vandals had caused the line to fall. He could not establish one way or the other whether the damage was caused by vandalism.

Through the introduction of answers to requests for admissions, it was established that Norris' inspection of the line was "ongoing," but the last time the line had been "formally" inspected was November 19, 1996. Pollard admitted that powerlines do not ordinarily fall down and that something has to

happen to cause them to fall down. He admitted that it is up to Norris to take care of and maintain the poles, the conductor, and the wires. Norris tells its customers not to climb the poles, and it is common knowledge that they do not do so. No one else is allowed to have any control over the wire. All maintenance of the wire is done by Norris, and inspection is done by an outside contractor. Koch testified that he had never seen anyone climbing those poles except employees of Norris.

Pollard admitted that there was no visible vandalism to the wire or any damage to the wire and that something normally causes lines to fall. Pollard testified that such events sometimes occur as the result of vandals or hunters shooting at the towers and powerlines. He further testified that Norris experiences approximately three outages per year due to vandals and hunters shooting at powerlines. As an example, Pollard explained that approximately 1 month before trial, vandals had shot down a powerline 11 miles north of the Koches' farmstead and that this resulted in an outage. He added, however, that not all acts of vandalism result in full outages. On cross-examination, Pollard admitted that he did not know whether any vandalism had been reported in the area of the Koches' farmstead before the incident leading to the present litigation. Norris did not treat the Koches' fire as vandalism because it could not tell from the burned line whether vandals were involved in the damage to the powerline.

After Koch's testimony, the Koches rested and Norris made a motion for directed verdict. The Koches had alleged specific acts of negligence and res ipsa loquitur as theories of recovery, and the trial court sustained the motion as to the negligence portion of the petition, but it reserved ruling on the res ipsa loquitur claim and took the matter under advisement. Norris proceeded to present its evidence through Pollard's testimony. After both sides rested, Norris renewed its motion for a directed verdict. The trial court took the matter under advisement and later entered a written order granting Norris' motion for directed verdict. The trial court found that insufficient evidence was introduced to prove Norris had exclusive control of the powerlines and that the incident would not have occurred without negligence by Norris. The Koches now appeal.

## ASSIGNMENTS OF ERROR

The Koches allege the trial court erred in (1) finding insufficient evidence that the powerline was in Norris' exclusive control and the incident would not have occurred without Norris' negligence and (2) requiring the Koches to show there was no possibility that a third party rather than Norris caused their injuries and further to conclusively rule out other reasonable possibilities for the powerline falling.

## STANDARD OF REVIEW

The court in *Haag v. Bongers*, 256 Neb. 170, 181-82, 589 N.W.2d 318, 328 (1999), stated:

In reviewing the action of a trial court, an appellate court must treat a motion for a directed verdict as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed. Such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence. . . . A directed verdict is proper at the close of all the evidence only where reasonable minds cannot differ and can draw but one conclusion from the evidence, that is to say, where an issue should be decided as a matter of law.

(Citations omitted.)

## ANALYSIS

The Koches submitted their entire case under a theory of res ipsa loquitur.

Res ipsa loquitur operates as a type of circumstantial evidence, that is, "facts or circumstances, proved or known, from which existence or nonexistence of another fact may be logically inferred or deduced through a rational process." [Citations omitted.] Regarding res ipsa loquitur, "[t]he requirement that the occurrence be one which ordinarily does not happen without negligence is of course only another way of stating an obvious principle of circumstantial evidence: that the event must be such that in the light of ordinary experience it gives rise to an inference that someone must have been negligent." Prosser and

Keeton on the Law of Torts, *Circumstantial Evidence—Res Ipsa Loquitur* § 39 (5th ed. 1984).

*Anderson v. Service Merchandise Co.*, 240 Neb. 873, 880, 485 N.W.2d 170, 175 (1992). " 'The essence of res ipsa loquitur is that the facts speak for themselves and lead to a proper inference of negligence by the fact finder without further proof.' " *Swierczek v. Lynch*, 237 Neb. 469, 477, 466 N.W.2d 512, 517 (1991). See, also, *Long v. Hacker*, 246 Neb. 547, 520 N.W.2d 195 (1994). Res ipsa loquitur "is an exception to the general rule that negligence cannot be presumed" from the mere occurrence of an accident. *Chism v. Campbell*, 250 Neb. 921, 927, 553 N.W.2d 741, 746 (1996). *Chism* further stated that "[t]he crucial question in any res ipsa loquitur situation is whether the doctrine applies at all." *Id.* at 928, 553 N.W.2d at 746.

In order that the doctrine of res ipsa loquitur may be invoked, it must be shown that the occurrence is one which would not, in the ordinary course of things, happen in the absence of negligence; the instrumentality which produces the occurrence is under the exclusive control and management of the alleged wrongdoer; and there is an absence of explanation by the alleged wrongdoer.

*Roberts v. Weber & Sons, Co.*, 248 Neb. 243, 247, 533 N.W.2d 664, 667-68 (1995). See, also, *Darrah v. Bryan Memorial Hosp.*, 253 Neb. 710, 571 N.W.2d 783 (1998). "Res ipsa loquitur allows the inference of the defendant's negligence because the inference 'is probable and more plausible than any other explanation propounded. . . .' " *Swierczek*, 237 Neb. at 477, 466 N.W.2d at 517.

"Thus, res ipsa loquitur is not a matter of substantive law, but, as a form of circumstantial evidence, is a procedural matter." *Anderson*, 240 Neb. at 880, 485 N.W.2d at 176. The *Roberts* court listed three elements which the plaintiff must prove in order to invoke the doctrine of res ipsa loquitur: (1) The occurrence is one which would not, in the ordinary course of things, happen in the absence of negligence; (2) the instrumentality that produced the occurrence was under the exclusive control and management of the defendant; and (3) there is an absence of an explanation by the alleged wrongdoer. The *Roberts* court went on to analyze the facts of that case under these three elements. Below, we shall attempt to do so in the case at hand.

First, we observe that the trial court appears to have resolved the case under the second element. The trial court cited *Darrah* in support of the statement: "They [the Koches] must show that there was no possibility that a third party, not [Norris], could have caused the injury." Of course, the evidence does not show there is no possibility that a third party could have caused the injury. Clearly, the Koches could not carry that burden, and therefore the trial court granted Norris' motion for a directed verdict. For the reasons stated below, we do not believe the Koches have the burden assigned to them by the trial court. We shall proceed to analyze this case under the three elements for the application of res ipsa loquitur listed above.

*Was Occurrence One Which Would Not, in Ordinary Course of Things, Happen in Absence of Negligence?*

We find no Nebraska cases either applying or refusing to apply the doctrine of res ipsa loquitur to the situation where a powerline falls and damages a plaintiff. In secondary authorities, we find the following authoritative statement:

> The doctrine of res ipsa loquitur finds frequent application in electrical cases where the circumstances of the accident are such as to create a presumption or inference of negligence. . . . So the fact that wires carrying a dangerous current of electricity have broken or sagged or become detached from their poles and caused injury is generally held to raise a presumption of negligence, although there is authority to the effect that the doctrine does not apply in such case.

29 C.J.S. *Electricity* § 66(2) at 1145-47 (1965). The only case cited in support of the minority view referred to in the last line of the above quote was *Derrick v. Harwood E. Company,* 268 Pa. 136, 111 A. 48 (1920). In that case, the plaintiff claimed a defective transformer caused a fire in the plaintiff's building, and the court stated the doctrine of res ipsa loquitur could not be applied unless the electric current was transferred only via the defendant's wire, but the evidence showed that for part of the distance, the transfer was over the plaintiff's wires.

> It is declared to be a matter of common knowledge that high-voltage wires do not ordinarily fall upon the highway

without negligence on the part of those in control of such wires, and in order to overcome the prima facie case presented when injury occurs by coming in contact with a fallen wire, the company must make a showing of the condition of the wire at the time it fell, as well as a showing of proper installation.

27A Am. Jur. 2d *Energy and Power Sources* § 445 at 332 (1996).

We have made a thorough search for cases from other jurisdictions that might shed light upon whether the facts in this case satisfied the first element of res ipsa loquitur. We find these cases usually turn upon whether the facts in evidence show the line could have fallen without negligence on the part of the defendant. Frequently, the outcome of the cases is determined by whether an act of nature or of some third party could have caused the line to fall. This analysis is properly considered under the second element of res ipsa loquitur, but it is so intertwined with the facts properly considered under the first issue that we are reviewing in our analysis under the first element.

The recent case of *Cosgrove v. Commonwealth Edison Co.*, 315 Ill. App. 3d 651, 734 N.E.2d 155, 248 Ill. Dec. 447 (2000), held res ipsa loquitur was not applicable to a fallen powerline for the stated reason that powerlines may fall without negligence of the power company, but the evidence in that case showed that there was a strong storm and rain shortly before the line went down and that a fire captain testified those "things" could have brought down the line. A somewhat similar holding was pronounced in *Rajabi v. Potomac Elec. Power Co.*, 650 A.2d 1319 (D.C. 1994), where a large glass globe from an overhead street light fell and hit the plaintiff. Res ipsa loquitur was held inapplicable upon the basis of intervening causes such as weather and traffic which made it impossible for the municipality to have exclusive control over street lights. However, there was no evidence of traffic affecting the line.

In *Spillars v. Louisiana Power & Light Co.*, 49 So. 2d 474 (La. App. 1950), a boy was electrocuted and another was injured when they touched a wire that had been thrown over a powerline by the boys themselves or by some third person. Res ipsa loquitur was held not applicable to establish the power company's negligence. In *Rodela v. Southern California Edison*

*Company*, 148 Cal. App. 2d 708, 307 P.2d 436 (1957), a heavy transformer fell when a pole broke, and there was evidence that the pole broke because of heat from equipment that did not belong to the power company, causing the pole to burn and then break. The plaintiff appealed from a judgment for the defendant seeking a holding that res ipsa loquitur required the opposite judgment as a matter of law. *Rodela* held that whether facts existed for the doctrine to be applied was a fact question for the trier of fact. See, also, *Loomis v. Toledo Rys. & L. Co.*, 107 Ohio St. 161, 140 N.E. 639 (1923) (court recognized that doctrine of res ipsa loquitur applies where poles and wires fell into street and injured persons and property lawfully traveling upon street; doctrine does not apply when there exists strong probability that injury was caused by act of God, that is, "vis major"); *Olivares v. San Antonio Public Service Co.*, 134 S.W.2d 821 (Tex. App. 1939) (res ipsa loquitur held not applicable because jury specifically found downed powerlines caused by lightning). Except for the *Rajabi* case, the evidence in all of these cases showed a likelihood that the falling line was due to the action of the weather or some third party.

In several other cases, the plaintiffs were allowed to recover for damage done by a downed powerline on the basis of res ipsa loquitur where no explanation was available to explain why the line fell. See, *Ledet et al. v. Lockport Power & Light Co.*, 15 La. App. 426, 132 So. 272 (1931) (power company held liable, but res ipsa loquitur not discussed; liability based upon company's failure to have safety device which would have cut off power when line went down and for leaving wire down for more than 1 day); *Burns v. Holyoke Street Railway*, 253 Mass. 443, 149 N.E. 127 (1925) (overhead trolley wire fell and woman was injured; res ipsa loquitur held to apply because according to common experience overhead trolley wires do not fall without fault by defendant); *Williams v. City of Canton*, 138 Miss. 661, 103 So. 811 (1925); *Gray v. Union Elec. L. & P. Co.*, 282 S.W. 490 (Mo. App. 1926) (defendant's downed line established prima facie case under res ipsa loquitur, but evidence that decedent voluntarily placed himself in dangerous situation prevented recovery); *Faust v. Benton County PUD*, 13 Wash. App. 473, 535 P.2d 854 (1975); *Martin v. Power Co.*, 109 W. Va. 129, 153 S.E. 245 (1930) (res

ipsa loquitur held to establish prima facie case sufficient to justify directed verdict for plaintiff because defendant made no showing of condition of wire or of its proper installation).

In still other cases, res ipsa loquitur was applied to allow recovery notwithstanding that fact issues arose which, if established, would have made the doctrine inapplicable. See, *Taylor v. Pacific Gas & Elec. Co.*, 57 Cal. App. 2d 11, 134 P.2d 12 (1943) (plaintiff claimed powerline fell and hit automobile and automobile hit power pole, but defendant claimed vehicle hit power pole causing wire to break); *Manuel v. Pacific Gas & Elec. Co.*, 134 Cal. App. 512, 25 P.2d 509 (1933) (issue existed whether boy's shooting at wire could have damaged it, but issue was held for jury); *Tassin v. Louisiana Power & Light Company*, 250 La. 1016, 201 So. 2d 275 (1967) (power company suggested but did not prove other possible causes); *Gas & Elec. Co. v. Waldsmith*, 31 Ohio App. 118, 166 N.E. 588 (1929) (evidence showed storm could have been act of God preventing application of doctrine, but evidence also showed wire fell before storm).

The thread that runs through all of the above-cited cases, which is all the cases we found on the subject, is that powerlines do not normally fall without fault on behalf of the company that maintains them and that res ipsa loquitur is applied in the absence of a substantial, significant, or probable explanation (but this standard seems to vary from jurisdiction to jurisdiction). Generally in the cases which hold the doctrine does not apply, the reasons cited for that conclusion have to do with the powerlines not being under the exclusive control of the power company, which is really a consideration under the second element of res ipsa loquitur, or that the powerline was caused to be down by the act of the plaintiff, of nature, or of some third party, which is a reason usually treated under the third element of res ipsa loquitur. However, all of the above-cited cases seem to be based upon the proposition that, and the majority rule seems to be, if a powerline falls without explanation, then the fall is attributed to the power company if that line is under the exclusive control of the power company. In other words, powerlines do not, in the ordinary course of events, fall in the absence of negligence.

The situation in *Anderson v. Service Merchandise Co.*, 240 Neb. 873, 485 N.W.2d 170 (1992), is similar to that of a powerline

falling with no explanation. In *Anderson*, the plaintiff was hit when an overhead light fell upon her in a store. One defendant had contracted with the store to service and maintain the lights. The trial court granted summary judgment in favor of both defendants because neither had exclusive control of the light system in the store. The major question before the *Anderson* court concerned whether the defendants had exclusive control over the object which hit the plaintiff, which the trial court held the defendants did not. However, at this point, we cite the case for the little discussed point that the Supreme Court held: " '[I]n the ordinary course of things,' part of a light fixture attached to a building's ceiling does not, in the absence of negligence, fall and injure an invitee." *Id.* at 881, 485 N.W.2d at 176. The doctrine was held applicable to establish a prima facie case against the store defendant, but not the defendant who had contracted to service the light.

We believe wires attached to power poles are subject to the same principle. Almost everyone is aware of the thousands of miles of powerlines which are not expected to fall except when exposed to extreme weather. There was no claim by Norris that the 40-mile-per-hour wind was extreme. It seems clear that powerlines should be built and maintained so they do not fall without the intervention of nature or a person and that therefore if a line falls without explanation, it must have been negligently constructed or maintained. It would seem the cases recognize without articulating a principle that if any entity is to put something in the air which has the potential to fall and injure or damage other people, the entity doing so is responsible to see that the "thing" is built and maintained so that without the intervention of nature or third persons the "thing" does not fall and injure somebody. Such a principle has the effect of tending to ensure that the "thing" is built and maintained properly and that when the "thing" falls, the responsible entity does not discard the "thing" into a Dumpster or destroy it by undisclosed testing before the injured party has an opportunity to learn if the "thing" was not safely built or maintained.

Furthermore, such evidence as there is on the subject in this case is in accordance with that notion. Koch testified that the weather was sunny but windy. There is no evidence or claim that a 40-mile-per-hour wind in this area is abnormally high. Koch

testified that he had never seen weather factors, except tornadoes and ice storms, damage powerlines. Pollard admitted that powerlines do not ordinarily fall down and that something has to cause them to fall. The fact that Norris felt it necessary to introduce evidence of possible damages by vandals shooting the line show that Norris cannot seriously maintain that the line did not fall on its own without its being either built or maintained in a negligent manner. Norris does not contend that nature is a cause of the downed line in this case. We believe the effect of the act or possible act of a third party is properly considered under either the second or the third elements of res ipsa loquitur.

We therefore conclude that the first of the three elements for the application of res ipsa loquitur is established.

### Was Instrumentality That Produced Occurrence Under Defendant's Exclusive Control and Management?

This element is the element in which the trial court relied on *Darrah v. Bryan Memorial Hosp.*, 253 Neb. 710, 571 N.W.2d 783 (1998), to sustain Norris' motion for directed verdict. For support of that holding, the trial court stated that the Koches "must show that there is no possibility that a third party, not [Norris], could have caused the injury." In *Darrah*, the plaintiff sued a hospital for injuries received during a medical procedure and attempted to establish liability by the res ipsa loquitur doctrine. However, the plaintiff had been under the care of three doctors, none of whom were considered agents of the hospital. The *Darrah* court traced the possibilities of negligence in the situation that the plaintiff was in and listed the acts which could have caused the plaintiff's injury for which the hospital would not be liable. While the *Darrah* court did make the statement that the plaintiff must prove there was "no possibility" the plaintiff's injury was caused by a third party, the facts in that case show that the plaintiff's damages could have been caused by the act of the doctors caring for the plaintiff. This situation is hardly analogous to the situation in the case at hand.

There is a long history of nonmedical cases which do not prohibit reliance upon the res ipsa loquitur doctrine because of a possibility that the act of someone else might have caused the injury. In *Asher v. Coca Cola Bottling Co.*, 172 Neb. 855, 112

N.W.2d 252 (1961), the doctrine was held to apply and therefore to support a finding that a bottling company was negligent when it sold and delivered a bottle of soda pop containing a mouse to a cafe several days before the cafe sold the bottle to the plaintiff, notwithstanding the defendant's argument that a competitor or a prankster could have placed the mouse in the bottle and recapped it while the bottle was in the possession of the cafe. The *Asher* court noted that there was no evidence of tampering by anyone and that the jury had a reasonable basis for finding that the mouse was in the bottle when it was delivered to the cafe. This fact situation is analogous to Norris' claim that vandals could have shot at the powerline.

 The Nebraska Supreme Court has stated the following by quoting from a recognized authority:

> As further noted by Prosser and Keeton: "The plaintiff is not required to eliminate with certainty all other possible causes or inferences, which would mean that the plaintiff must prove a civil case beyond a reasonable doubt. All that is needed is evidence from which reasonable persons can say that on the whole it is more likely that there was negligence associated with the cause of the event than that there was not. It is enough that the court cannot say that the jury could not reasonably come to that conclusion. Where no such balance of probabilities in favor of negligence can reasonably be found, res ipsa loquitur does not apply."

*Anderson v. Service Merchandise Co.*, 240 Neb. 873, 880, 485 N.W.2d 170, 176 (1992). The *Anderson* court went on to state that if the doctrine applies the inference of negligence, it may, but need not, be drawn by the fact finder.

In *Brown v. Scrivner, Inc.*, 241 Neb. 286, 488 N.W.2d 17 (1992), the plaintiff was injured by an automatic door in the defendant's retail store. In reversing a summary judgment dismissing the plaintiff's claim, the court said that in the ordinary course of things, automatic doors do not injure those who pass through them and that therefore a reasonable person could conclude that negligence was associated with the malfunction of one. In that case, there was evidence to suggest that the defendant had had trouble with the door before on windy days. The court stated that the introduction of such evidence did not defeat

the application of the doctrine by introducing evidence of specific acts of negligence where the evidence leaves the cause of the accident in doubt or does not clearly show the cause.

In *Harvey v. Metropolitan Utilities Dist.*, 246 Neb. 780, 523 N.W.2d 372 (1994), the trial court found that a fire in the plaintiff's home was caused by a gas leak from a meter which the defendant had installed in the plaintiff's home a little over a month before the fire and explosion. The defendant argued that the doctrine of res ipsa loquitur could not be applied because the defendant did not have exclusive control of the gas meter. The *Harvey* court interpreted the *Asher* case as requiring that "the plaintiff prove either that there was no reasonable opportunity for tampering or that no actual tampering with the instrumentality occurred from the time the defendant controlled it until the time of the injury." 246 Neb. at 785, 523 N.W.2d at 376. The *Harvey* court also stated that based upon the dangerous nature of the natural gas, the defendant had a heightened duty of care. We also note that several of the cases from other jurisdictions assigned a similar heightened duty of care to power companies.

In the case at hand, the evidence shows without dispute that the wire which fell was placed high into the air by Norris and that of course, it was obviously regularly charged with high voltage. To expect anyone to interfere with Norris' control, except perhaps by throwing or shooting something, is ridiculous. Pollard admitted that it was up to Norris to take care of the line, that its customers do not climb the line poles and it is common knowledge that people do not do so, and that no one except Norris employees and those entities it has contracts with are allowed to have any control over the line. Except for the possibility of vandalism, there is no reasonable possibility that the wire fell as the result of anything other than Norris' not properly building or maintaining the line. We conclude that for purposes of the doctrine of res ipsa loquitur, Norris had exclusive control and management of the powerline.

## *Is There Absence of Explanation by Alleged Wrongdoer?*

The only explanation that Norris came up with was the possibility that either vandals or hunters damaged the line. The possibility of damage from hunters or vandals seems weak at best. There is no evidence of vandals being in the area or that general

vandalism was so common as to justify the assumption that vandals shot the line. There is no evidence that the guns used by squirrel hunters or dove hunters are of a type that are likely to damage a high line, but general notions of hunting and the firearms used to accomplish it leaves us wondering what a gun of sufficient power to damage a high line would do to either a squirrel or a dove. To allow Norris to escape liability as a matter of law solely upon the unsupported claim that vandals caused the break seems to allow the finder of fact to decide an important question on guess and speculation. In any case, recovery under res ipsa loquitur should not be denied as a matter of law solely as the result of that type of evidence.

In *Roberts v. Weber & Sons, Co.*, 248 Neb. 243, 533 N.W.2d 664 (1995), recovery for damages done by cattle that escaped onto a road was upheld based upon res ipsa loquitur. The *Roberts* court analyzed the facts in that case under the three elements as we have done. The first element was held satisfied because the evidence showed that cattle do not ordinarily escape from pens such as the one maintained by the defendant in that case, and the second element was satisfied because the defendant's pens were clearly under the defendant's control. On the third element, the defendant offered evidence that the cattle escaped when a hinge on a gate broke, but the plaintiff offered evidence that that explanation was not credible. This issue was held to be one for the jury. We understand that the trial court first determines whether res ipsa loquitur applies as a matter of law under the three criteria articulated above, and if it does, then submits the inference of negligence to the fact finder, who may accept or reject the inference as a factual determination of whether the defendant was negligent. See, also, *Anderson v. Service Merchandise Co.*, 240 Neb. 873, 485 N.W.2d 170 (1992). This would leave a determination of liability in this case to the trier of fact, with or without the suggestion that acts of vandals or hunters were a cause.

## CONCLUSION

For the reasons given, we find that the trial court should not have granted Norris' motion for a directed verdict. We therefore reverse, and remand for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.